# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs July 21, 2010

## TIMOTHY NEAL JAMES v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Sumner County**
**No. 89-2008     Dee David Gay, Judge**

**No. M2009-02167-CCA-R3-PC - Filed October 29, 2010**

Pursuant to a plea agreement, the Petitioner, Timothy Neal James, pled guilty to two counts of rape of a child and one count of incest, and the trial court sentenced him to an effective sentence of twenty-five years in the Tennessee Department of Correction.  The Petitioner filed a petition for post-conviction relief, which the post-conviction court denied after a hearing.  On appeal, the Petitioner contends that he received the ineffective assistance of counsel and that his guilty plea was not knowingly and voluntarily entered.  After a thorough review of the record and applicable law, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which JERRY L. SMITH and ALAN E. GLENN, JJ., joined.

M. Allen Ehmling, Gallatin, Tennessee, for the Appellant, Timothy Neal James.

Robert E. Cooper, Jr., Attorney General and Reporter; Michael E. Moore, Solicitor General; Lacy Wilber, Assistant Attorney General; L. Ray Whitley, District Attorney General; Sallie Wade Brown, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION
### I. Facts
### A. Guilty Plea

        This case arises from the Petitioner engaging in sexual conduct with his stepson and his stepson's friend.  A Sumner County grand jury indicted the Petitioner for eight counts of rape of a child, three counts of incest, and one count of attempted incest.  At the Petitioner's plea hearing, the State summarized the evidence supporting the Petitioner's charges as

follows:

On March 21ˢᵗ of this year, Carl Edison with the Sumner County Sheriff's Department, working hand in hand with the Department of Children's Services, began an investigation concerning allegations that the [Petitioner] had inappropriate sexual contact with male juveniles.

[The victim] was eight years of age at the time. . . . There was [L.M.[1]] and [M.C.] . . . [M.C.] was the stepson of [the Petitioner], and [L.M.] was a close friend of [the Petitioner's] stepson. They were at [the Petitioner's] home on numerous occasions playing. [L.M.] described the [Petitioner] as performing oral sex by sucking on his penis as well as several other occasions that include February and March of 2006. During the interview with [M.C.], he also described an event where [the Petitioner] also sucked his penis.

During an interview with the [Petitioner] by Detective Edison, he confessed to participating in the above-described acts with both [L.M.] and [M.C.] at the residence indicated on the warrant in this case. Based on the statements of both [M.C.] and [L.M.] and the statements by the [Petitioner] to Detective Edison, we are submitting this case for plea.

Pursuant to a plea agreement, the Petitioner pled guilty to two counts of rape of a child, a Class A felony, one count of incest, a Class C felony, and the remaining counts were dismissed.

At the beginning of the plea hearing, in response to questions by the trial court, the Petitioner testified that he had received a medical assistant's degree. The trial court then reviewed the charges against the Petitioner. The Petitioner testified that he understood he was pleading guilty to rape of a child, a Class A felony, and that he would receive the maximum sentence within the range to be served at one hundred percent. The Petitioner testified that he understood that he was also pleading guilty to incest, a Class C felony, and that he would receive the maximum sentence within the range to be served at thirty percent. The Petitioner agreed that he reviewed the indictment and the State's evidence against him with his attorney ("Counsel").

The trial court then reviewed the Petitioner's rights with the Petitioner, who agreed that he understood his rights and that he was waiving those rights by entering the negotiated plea agreement. The Petitioner testified that he was pleading guilty to these charges, "voluntarily

---

[1]It is the policy of this Court to refer to juvenile victims of sexual assault by their initials only.

and of [his] own free will." When the Petitioner was asked whether he was satisfied with Counsel's representation, he responded, "Extremely," and agreed that Counsel had provided competent advice. The Petitioner testified that there was not anything the Petitioner wanted Counsel to do for his case that Counsel did not do. The Petitioner then recited the charges and sentences to which he was pleading guilty. The trial court asked whether the Petitioner was under the influence of drugs or alcohol, to which the Petitioner responded in the negative. The Petitioner agreed that his signature was at the bottom of the plea agreement form.

Finally, the Petitioner testified that he was guilty as to two counts of rape of a child and one count of incest. The trial court found the Petitioner guilty and sentenced him to twenty-five years for each count of rape of a child and to six years for the one count of incest, with all convictions to run concurrently, for a total effective sentence of twenty-five years to be served at 100%.

At the end of the plea submission hearing, Counsel requested that he be allowed to ask the Petitioner a few questions on the record. The Petitioner agreed that Counsel had provided him with a copy of all discovery in the case, which included: detailed statements from both victims, results of a voice stress test conducted on the Petitioner, and the Petitioner's admissions to Detective Edison. Counsel asked the Petitioner if he recalled Counsel reviewing the videotape of the Petitioner's statements, discussing the statements with the Petitioner, and sending the Petitioner a letter outlining portions of the Petitioner's statements that could be used as a basis for a suppression motion. The Petitioner agreed and testified that the Petitioner did not want a suppression motion to be filed. Counsel asked Petitioner if he recalled Counsel providing him with information regarding suppression of the voice stress test. The Petitioner's response to Counsel's question about whether he wanted to pursue a suppression motion was, "I just wanted to get this over with. I knew I was guilty." Finally, Counsel concluded by confirming, "I wanted to clarify and make [ ] clear for the record [ ] that you're making these pleas not just intelligently but with full information of the facts, what you said, and my research of the law. Is that right?" The Petitioner responded, "That's correct."

## B. Post-Conviction Hearing

The Petitioner filed a petition for post-conviction relief claiming that he received the ineffective assistance of counsel and that his guilty plea was not knowingly and voluntarily entered. The post-conviction court held an evidentiary hearing wherein the following evidence was introduced: The Petitioner testified that his brother hired Counsel for the Petitioner using money received for items the Petitioner instructed his brother to sell. The Petitioner recalled that, at a settlement court date, Counsel told the Petitioner that the State had made an offer of twenty-five years. The Petitioner asked Counsel to negotiate for less

time and asked Counsel for "legal advice on what to do." The Petitioner said that Counsel responded, saying, "I'm not here to give you legal advice. . . . You didn't hire me; your brother did, and you should remember that." The Petitioner said that he never asked Counsel what he meant by those statements, but that the statements were "just another thing to help push me to just give up, just to comply and give up."

Given this testimony, the Petitioner was asked why he would then testify at the guilty plea hearing that Counsel provided excellent representation, to which the Petitioner responded, "That's part of my personality. I'm very complacent [sic] for people. I didn't see any reason to further do any damage to him or myself." The trial court then asked whether the Petitioner lied at the guilty plea hearing, and the Petitioner said that he did not, explaining that, at the time of the hearing, he believed that Counsel had done a good job but later became aware of "laws" that Counsel should have pursued.

Specifically, the Petitioner testified that the Petitioner told Counsel that he had been awake for three days at the time he made his confession, and thus he did not really know what he was doing. The Petitioner said that Counsel responded that this "really didn't matter." The Petitioner recalled that Counsel viewed the videotaped confession multiple times, but Counsel focused on the issue of whether the police officers violated the Petitioner's right to counsel and not on the Petitioner's sleep deprivation. The Petitioner acknowledged that he did not pursue the issue of his sleep deprivation after Counsel "continuously told [him] it wouldn't do any good." The Petitioner said that he was "really not coherent" at the time and was relying on "whatever" Counsel told him.

The Petitioner testified that, while discussing the State's plea offer with Counsel, the Petitioner was physically shaking and requested that Counsel ask the trial court if the Petitioner "could just get a lethal injection" rather than take the State's offer of a twenty-five year sentence. The Petitioner said that Counsel's response to this request was, "[T]he judge can't do that" and then Counsel "got up and left."

The Petitioner recalled that Counsel called the Petitioner's brother and told him that the Petitioner was not "coherent" and "unable to make any decisions" and requested that the Petitioner's brother make decisions for the Petitioner. Counsel returned to speak with the Petitioner after the phone call and said, "Well, your brother said to take the plea if you ever want to live to see daylight again." The Petitioner said that he did not speak with his brother about this communication.

The Petitioner reviewed a letter Counsel sent him stating that Counsel had reviewed the videotape of the Petitioner's confession. It communicated the State's plea offer and noted that the victims' testimonies were "solid." The letter also laid out specific language from the

videotape where the Petitioner mentioned seeking a lawyer. Counsel said, in the letter, that this could be used as a basis for a suppression motion and whether to file such a motion was the Petitioner's decision. The Petitioner maintained, however, that he never specifically told Counsel not to file a suppression motion based upon his sleep deprivation, rather he just "gave up."

The Petitioner's other complaint was regarding Counsel's representation of the percentage of his sentence the Petitioner would serve. The Petitioner testified that he understood that the twenty-five year sentence was to be served at one hundred percent, but that the Petitioner found a statute that indicated his charges could be reduced to eighty-five percent. The Petitioner said he asked Counsel about this, and Counsel said he did not think that was the case. The Petitioner showed Counsel the statute section and Counsel responded, "Well, if it says it there, then it's got to be true." The Petitioner said he then requested that Counsel confirm this before he entered the plea agreement but that Counsel did not do so. The Petitioner explained that he did not ask the trial court about the percentage during his plea soliloquy because he was "like in a fog, lethargic. I was just like, okay, whatever." The Petitioner also acknowledged that he did not follow up and ask Counsel about the percentage again, explaining that he "just wasn't thinking clearly." The Petitioner was asked whether his decision to plead guilty would have changed if he had known the sentence could not be served at eighty-five percent. The Petitioner responded, "I really don't know because, like I said, I wasn't really there. I was just messed up in the head."

The Petitioner testified that, based upon his misunderstanding regarding the percentage of the sentence he would serve, his plea was not knowingly and voluntarily entered. The Petitioner recalled that he was constantly shaking and crying during his discussions with Counsel regarding the plea offer and that he did not understand all that Counsel was trying to communicate to him. The Petitioner described himself as "numb" during the guilty plea hearing.

On cross-examination, the Petitioner admitted that he did not raise the specific issue of sleep deprivation as a basis for Counsel being ineffective in his petition for post-conviction relief. The Petitioner further agreed that the post-conviction hearing was the first time he mentioned his sleep deprivation. The Petitioner also acknowledged that he did not mention his sleep deprivation to Dr. Donna Moore who conducted his psychosexual evaluation. The Petitioner agreed that he was given a copy of the psychosexual report but that he only read the back page because his hands were shaking so badly. The psychosexual report indicated that the Petitioner told Dr. Moore he did not have a history of mental health issues, but the Petitioner denied remembering telling Dr. Moore this. The Petitioner agreed that he had participated in a prior psychosexual evaluation in 1999 and there was a previous investigation involving M.C. when M.C. was four years old.

The Petitioner agreed that, in addition to his admissions to detectives, the evidence against him included letters he had written to M.C. and M.C.'s mother apologizing for his conduct. The Petitioner agreed that he recalled the State's attorney announcing his sentence, which was twenty-five years to be served at one hundred percent, at the guilty plea hearing. He also agreed that his signature was on the waiver of jury trial form that indicated his total sentence was twenty-five years at one hundred percent.

The Petitioner agreed that Counsel offered to show the Petitioner the videotaped confession so they could discuss it, but the Petitioner declined. The Petitioner explained this decision not to watch the videotape was based upon Counsel's statements that "it wouldn't do any good, but [Counsel] could bring it in if [the Petitioner] wanted [Counsel] to." The Petitioner agreed that he consistently told Counsel he did not want a trial on these charges.

The Petitioner identified a letter he sent to Counsel stating that he did not "plan" to go to trial and requesting Counsel seek "the best deal" he could. The Petitioner said that based on his discussions with "other people" and looking "at cases and everything" he determined that a fair sentence for his convictions was fifteen years. The Petitioner agreed that, during the guilty plea hearing, he testified that he was voluntarily pleading guilty, but he explained that due to his lack of knowledge of the law and "mental condition" he thought "everything was fine." The Petitioner described his mental condition as, "The mental condition was being locked up back here in a dark room for 11 months without seeing the sun shine or anything, and it's very depressing and it brings a person down to where they stop thinking clearly." The Petitioner agreed that, in this respect, he was not different from any other jailed defendant who enters a plea agreement.

On redirect examination, the Petitioner testified that, in his letter to Counsel, he indicated he was having emotional problems. The portion of the letter the Petitioner referred to read, "like a foolish, emotional wreck that I am, I confessed to some very horrible charges." The Petitioner reiterated that, at the time of the guilty plea hearing, he was relying on Counsel's advice that the Petitioner's sleep deprivation at the time of his confession to police, "didn't matter." He recalled that later, after the guilty plea hearing, he realized that his sleep deprivation may have been a ground for a suppression motion.

On recross-examination, the State entered the admonition and waiver signed by the Petitioner at the time he spoke with police officers. The Petitioner acknowledged that it was his signature at the bottom of the waiver.

Counsel testified that he had practiced law for twenty-eight years and represented clients in "probably thousands" of trials during his career. Counsel's practice consisted mainly of criminal and family law. Counsel testified that he has been appointed to represent

defendants in many "very serious sexual crime" cases. From the very beginning of his representation of the Petitioner, the Petitioner's main concern was that Counsel negotiate the "best deal possible" with the State, and the Petitioner never indicated that he wanted a jury trial on these charges. Counsel recalled that, at his initial meeting with the Petitioner, he did not yet have the discovery information on the case, but he met with the Petitioner for over an hour. Several days later, he received discovery on the case and gave the Petitioner a complete copy of the discovery. Based upon Counsel's recollection, he met with the Petitioner "at least eight times, maybe nine," with each of those meetings lasting at least an hour.

Counsel testified that he wanted the Petitioner to review the videotaped confession but that the Petitioner declined:

> [The Petitioner] was not–he was focusing on more or less that he didn't want to go to trial, which was a subject that he made very clear to me in the beginning. He did not want to go to trial. He did not want me to file motions. The idea of the videotape actually came up because I felt like I wanted to bring that to his attention and explain to him that we should at least try to research some issues or either go through some issues. It's not as though he said to me, I want you to do this. I brought that up to him.
>
> The videotape I wanted him to review. I thought it was important. It was the one piece of evidence that I did want him to review because there was an issue–and I explained this to him. I said there was an issue about him mentioning the idea of should I–in the taped conversation, should I have a lawyer or do you think I need a lawyer. I talked to him about that.

Counsel testified that he viewed the videotaped confession four times and did not see anything that indicated the Petitioner was sleep-deprived. Counsel recalled that he researched issues related to the videotaped confession and the voice stress analysis test but that the Petitioner was not interested in pursuing suppression issues but rather negotiating a plea offer for a lesser amount of time. Counsel testified that, in all his meetings with the Petitioner, the foremost issue was negotiating the best possible sentence with the State.

Counsel testified that he met with the Petitioner on each of the two days prior to the settlement hearing to discuss the State's offer. Counsel said that the Petitioner provided him with the name of a case where the defendant received a better sentence for what the Petitioner believed was a comparable conviction. Counsel reviewed the file for that case and spoke with the attorney who represented this other defendant, and Counsel learned that the facts of the case were completely different from those of the Petitioner's case. Counsel said that he discussed with the Petitioner the differing circumstances of each respective case.

Counsel testified that the Petitioner sent letters with admissions of guilt to his wife and stepson before his brother retained Counsel to represent the Petitioner. Counsel said that the Petitioner told Counsel that he sent the letters because the Petitioner wanted "to cleanse himself" and seek forgiveness. Counsel said that he spoke with the Petitioner about the possible sentence if the Petitioner were convicted of all the indicted counts and the possibility of consecutive sentencing. Counsel did not recall the Petitioner requesting a fifteen-year sentence but did recall the Petitioner requesting that he ask the State if they would agree to a twenty-year sentence.

Counsel testified that the Petitioner never told him that he had a mental illness, but Counsel said he knew the Petitioner was "upset" and "very afraid." Counsel said that, on more than one occasion, he told the Petitioner he would be willing to take the case to trial if the Petitioner so desired, and Counsel discussed certain strategies they could use at trial. Counsel said that the Petitioner was very clear he did not want to proceed to trial, in large part, because he did not want the victims to have to testify. Counsel said that he did not interview the victims but spoke with the State's attorney, who had interviewed the victims and indicated they were prepared to testify. Counsel also reviewed the victims' statements and provided them to the Petitioner. Counsel recalled that the Petitioner pointed out some inconsistencies in the victims' statements but that the Petitioner agreed that the substance of the claims, that the Petitioner engaged in oral sex with the two eight-year old boys, was true.

Counsel testified that he never told the Petitioner he could be released from prison early for overcrowding or discussed "good credits" with him. Counsel explained that one of the reasons he had the Petitioner sign and initial the waiver of a jury trial with the handwritten notation that the Petitioner was to serve twenty-five years at one hundred percent was that he did not want any misunderstandings.

Counsel denied telling the Petitioner that he would not discuss certain things with the Petitioner because the Petitioner's brother rather than the Petitioner himself hired Counsel. Counsel explained that he requested the trial court allow Counsel to ask additional questions of the Petitioner at the guilty plea hearing based upon Counsel's concerns with the Petitioner's approach to the case:

> I felt that [the Petitioner] was in some respect–I'm not saying not cooperating with me, but he didn't want to do things that I thought might be important. He didn't want to–he really didn't want to go to trial. He really didn't want me to file any motions. He was pretty–I think one reason why he didn't want to look at the videotape is he just really didn't want to discuss any of the issues in the videotape.

Counsel testified that there was not anything that he could have done for the Petitioner that he did not do.

On cross-examination, Counsel testified that he did not recall the Petitioner asking him to seek a motion to suppress based upon sleep deprivation at the time of the Petitioner's confession. Counsel said that the Petitioner said that he had not slept in "awhile" but it was never raised as an issue or concern by the Petitioner. Counsel said that, in reviewing the videotape, there was nothing indicating the Petitioner was sleep deprived or suffering from mental illness. Counsel testified that he had worked with defendants with mental health issues and was able to identify the need for a mental evaluation, but he did not see any such indicators with the Petitioner. Counsel described the Petitioner as "very calm, . . . very polite, and very cordial" in their discussions. Counsel acknowledged that, as the time for the guilty plea hearing drew closer, the Petitioner became more "nervous" due to the substantial sentence but reiterated that there was never an indication of mental illness.

Counsel testified that he requested the psychosexual evaluation and that he explained to the Petitioner that the outcome of this evaluation could help negotiate a lower sentence if it indicated an amenability to treatment. Counsel pointed out that the person administering the psychosexual evaluation was a licensed professional and made no note of mental illness that would impact the Petitioner's ability to comprehend the difference between right and wrong in the report. Counsel pointed out that the report was "very detailed" and was an indication that the Petitioner clearly cooperated by providing that information. The report summarizing the conclusions of the psychosexual evaluation indicated that the Petitioner was not truthful and a high risk for repeated sexual offenses.

Counsel denied calling the Petitioner's brother to ask him to make decisions because the Petitioner was mentally incapable of doing so. Counsel said that he kept the Petitioner's brother informed but never told the Petitioner's brother that the Petitioner was incapable of decision-making. Counsel said that the Petitioner was "afraid" of going to prison but was competent to enter a plea of guilty.

Counsel denied ever telling the Petitioner that his sentence would be reduced from one hundred to eighty-five percent. Counsel recalled that, during the guilty plea hearing, the trial court asked the Petitioner questions, several times, that related to his sentence to be served at one hundred percent, and the Petitioner never questioned it or stated there was a misunderstanding.

Based upon this testimony, the post-conviction court denied post-conviction relief. It is from this judgment that the Petitioner now appeals.

## II. Analysis

On appeal, the Petitioner asserts that he received the ineffective assistance of counsel and that his guilty plea was not knowingly and voluntarily entered.

In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. T.C.A. § 40-30-103 (2006). The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. T.C.A. § 40-30-110(f) (2006). Upon our review, the trial judge's findings of fact are given the effect and weight of a jury verdict, and this Court is "bound by the trial judge's findings of fact unless we conclude that the evidence contained in the record preponderates against the judgment entered in the cause." *Black v. State*, 794 S.W.2d 752, 755 (Tenn. Crim. App. 1990). Thus, this Court will not re-weigh or re-evaluate the evidence below; all questions concerning the credibility of witnesses, the weight and value to be given their testimony and the factual issues raised by the evidence are to be resolved by the trial court judge, not the appellate courts. *Momon v. State*, 18 S.W.3d 152, 156 (Tenn. 1999); *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997). A post-conviction court's conclusions of law, however, are subject to a purely de novo review by this Court, with no presumption of correctness. *Fields v. State*, 40 S.W.3d 450, 457 (Tenn. 2001).

### A. Ineffective Assistance of Counsel

The Petitioner argues that he received the ineffective assistance of counsel because Counsel failed to file a motion to suppress based upon the Petitioner's "sleep deprivation" at the time of his confession to detectives. The State responds that Counsel's performance was not deficient and that the Petitioner failed to prove he suffered prejudice as a result of Counsel's actions.

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. *State v. White*, 114 S.W.3d 469, 475 (Tenn. 2003); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). The following two-prong test directs a court's evaluation of a claim for ineffectiveness:

> First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so

serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable. Unless a [petitioner] makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Melson*, 772 S.W.2d 417, 419 (Tenn. 1989).

In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. *Baxter*, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, a petitioner must show that "counsel's representation fell below an objective standard of reasonableness." *House v. State*, 44 S.W.3d 508, 515 (Tenn. 2001) (citing *Strickland*, 466 U.S. at 688).

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. *Strickland,* 466 U.S. at 690; *State v. Mitchell*, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court must evaluate the questionable conduct from the attorney's perspective at the time. *Strickland*, 466 U.S. at 690; *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982). In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Burns*, 6 S.W.3d at 462. Finally, we note that a defendant in a criminal case is not entitled to perfect representation, only constitutionally adequate representation. *Denton v. State*, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (quoting *United States v. Cronic*, 466 U.S. 648, 665 n.38 (1984)). Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. *Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). The fact that a particular strategy or tactic failed or hurt the defense does not, standing alone, establish unreasonable representation. *House*, 44 S.W.3d at 515 (citing *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996)). However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation. *House*, 44 S.W.3d at 515.

If the petitioner shows that counsel's representation fell below a reasonable standard, then the petitioner must satisfy the prejudice prong of the *Strickland* test by demonstrating "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694; *Nichols v. State*, 90

S.W.3d 576, 587 (Tenn. 2002). This reasonable probability must be "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *Harris v. State*, 875 S.W.2d 662, 665 (Tenn. 1994). In the context of a guilty plea, as in this case, the prejudice requirement, focuses on whether the ineffective assistance of counsel affected the outcome of the plea process. Therefore, to satisfy the second prong of *Strickland*, a petitioner must show that "there is a reasonable probability that, but for Counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985).

In this case, the post-conviction court found:

> [T]he Petitioner [was] not believable nor credible. Petitioner had never mentioned in his Petition for Post-Conviction Relief the fact that he had been "sleep deprived." The first time that he ever mentioned that he was sleep deprived when he talked to the Gallatin Police Department was at the evidentiary hearing on the Post-Conviction Relief Petition. . . . Petitioner's trial attorney testified that he never noticed the Petitioner to be sleep deprived during the interrogation tapes. Further, Petitioner never mentioned to Dr. Moore that he was sleep deprived when he gave the complete background for the psycho-sexual evaluation. He also never told his attorney that he was sleep deprived. . . . [The Petitioner] further stated [at the guilty plea hearing] that there was nothing that his attorney could have done that [ ] he did not do in this particular case.
>
> . . . .
>
> The attorney for the Petitioner was very credible, and it was obvious to the Court that he had spent much time in the representation of the Petitioner in this particular case.

Indeed, the record supports the post-conviction court's findings of fact. Upon review of the record, we conclude that the Petitioner has failed to establish by clear and convincing evidence that he was, in fact, sleep deprived at the time of his confession, which is the premise upon which his argument relies. The Petitioner, other than his own bare assertions, offered no proof as to his sleep deprivation. The evidence shows that the Petitioner did not tell Counsel or Dr. Moore, who administered his psychosexual evaluation, about his sleep deprivation. Further, he failed to raise sleep deprivation as a specific allegation in his petition for post-conviction relief. Further, he failed to prove that Counsel was ineffective as to this issue. The Petitioner repeatedly acknowledged at the post-conviction hearing that he did not pursue the issue of sleep deprivation with Counsel. Counsel viewed the videotaped confession multiple times and saw no indication of sleep deprivation. Counsel requested the

-12-

Petitioner view the videotaped confession with Counsel which would have provided the opportunity for the Petitioner to point out specific actions on the videotape that supported his assertion of sleep deprivation, however, the Petitioner refused.

We also note that the Petitioner's position is somewhat inconsistent in that he faults Counsel for failing to pursue a motion to suppress on the basis of sleep deprivation, but he testified that he did not want Counsel to file suppression motions on other possible issues explaining, "I just wanted to get this over with. I knew I was guilty." His rationale for declining to file suppression motions based upon other issues belies his assertion that he wanted Counsel to seek a suppression motion on the issue of sleep deprivation. We conclude that Petitioner has failed to show by clear and convincing evidence he was sleep deprived and thus has failed to prove that his trial counsel was ineffective for failing to file a motion to suppress on this basis. The Petitioner is not entitled to relief as to this issue.

### C. Guilty Plea

Next, the Petitioner claims that his plea was not voluntarily entered because he did not understand that his sentence would be served at one hundred percent rather than reduced to eighty-five percent. Because he labored under this misunderstanding, the Petitioner contends that his guilty plea was not knowing and voluntary. The State asserts that the Petitioner knowingly and voluntarily pled guilty to these charges.

When evaluating the knowing and voluntary nature of a guilty plea, the United States Supreme Court has held that "[t]he standard was and remains whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant." *North Carolina v. Alford*, 400 U.S. 25, 31 (1970). The court reviewing the voluntariness of a guilty plea must look to the totality of the circumstances. *See State v. Turner*, 919 S.W.2d 346, 353 (Tenn. Crim. App. 1995); *see also Chamberlain v. State*, 815 S.W.2d 534, 542 (Tenn. Crim. App. 1990). The circumstances include:

> [T]he relative intelligence of the defendant; the degree of his familiarity with criminal proceedings; whether he was represented by competent counsel and had the opportunity to confer with counsel about the options available to him; the extent of advice from counsel and the court concerning the charges against him; and the reasons for his decision to plead guilty, including a desire to avoid a greater penalty that might result from a jury trial.

*Blankenship v. State*, 858 S.W.2d 897, 904 (Tenn. 1993) (*citing Caudill v. Jago*, 747 F.2d 1046, 1052 (6th Cir. 1984)). A plea resulting from ignorance, misunderstanding, coercion, inducement, or threats is not "voluntary." *Id.*

In the case under submission, the post-conviction court found:

In the guilty plea transcript the [Petitioner] admitted that his attorney had gone over with him the counts in the indictment, all the evidence that was to be used against him and that he was fully apprised of all the evidence that was going to be used against him. He further stated during the guilty plea hearing, as revealed in the transcripts, that he was not forced to come into court and plead guilty and that he was pleading guilty voluntarily and of his own free will. He further stated there had been no promises other than what had been announced in open court. . . . [W]hen asked by the court what he was pleading to and what sentences he was receiving he stated "I've got two (2) counts of Rape of a Child, the twenty-five (25) years at 100%, and on the Incest it's six (6) years at 30%." He understood that those sentences were running concurrent and that the total effective sentence was twenty-five (25) years at 100%.

. . .

The Petitioner's attorney [] stated that he never mentioned an 85% release date and the Petitioner's attorney noted on the Petition for Waiver of Trial by Jury and Request for Acceptance of a Guilty Plea, which was made an exhibit, that the [Petitioner] wrote, starred, and initialed "total sentence 25 years at 100% T.J." Counsel stated that he never would have said to Petitioner that if you "take this plea you will get 85%." Petitioner's attorney stated that [] is why he specifically had the [Petitioner] star, write out, and sign the 100% on the waiver form.

. . .

The guilty plea transcript was extremely strong evidence that Petitioner knew exactly what he was doing when he entered his guilty pleas on January 26, 2007.

. . .

Therefore, [] this Court specifically finds that the [Petitioner's] guilty plea was voluntarily and knowingly entered.

Our review of the record supports the conclusions of the post-conviction court. The

Petitioner, from the onset of Counsel's representation, made clear that he did not want to proceed to trial and wanted to enter a plea agreement with the State. The Petitioner did not question Counsel or the trial court, at the time of the guilty plea hearing and announcement of his sentence, about the release eligibility for his sentence. Moreover, the Petitioner, when asked by the trial court, said that his sentence was to be served at one hundred percent. The Petitioner testified at the guilty plea hearing that his guilty plea was entered freely and voluntarily and that he had not been pressured to accept the plea offer. At the guilty plea hearing, the trial court was very thorough in its explanation of the Petitioner's rights. Further, not only did the trial court fully question the Petitioner as to his rights, the charges, and the sentences, Counsel provided even more specific questioning of the Petitioner at the end of the guilty plea hearing. The Petitioner's responses to Counsel's questions further evidenced the Petitioner's understanding of the process and the voluntary nature of the guilty plea.

The post-conviction court found Counsel's testimony was credible. Further, the post-conviction court found the Petitioner's testimony at the guilty plea hearing credible when he testified that his plea was voluntary. It is not the province of this court to re-weigh a trial court's credibility determination, as that decision is best made by the trial court. *State v. Holder*, 15 S.W.3d 905, 912 (Tenn. 1999). Following our review of the record, we conclude that the Petitioner has failed to establish that the proof preponderates against the findings made by the post-conviction court that his plea was entered knowingly and voluntarily. Thus, the Petitioner is not entitled to relief as to this issue.

### III. Conclusion

After a thorough review of the record and relevant authorities, we conclude that the post-conviction court properly denied the Petitioner's petition for post-conviction relief. Accordingly, we affirm the judgment of the post-conviction court.

_____
ROBERT W. WEDEMEYER, JUDGE